IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KAMERON BUTLER,              *

                             *

    Plaintiff,         *    CIVIL ACTION FILE

                             *

vs.                   *    NO. 1:19-cv-3150-JPB

                             *

CHARLENE MICHELLE SMITH,   *

individually, and       *

CITY OF CONYERS, GEORGIA,  *

                             *

    Defendants.        *

## **COMPLAINT FOR DAMAGES**

### NATURE OF THE CASE

1.

This is a civil rights case.  It concerns a single mother whose unruly 17-year-old son manipulated a school resource officer into submitting a materially misleading arrest warrant application, in which the officer accused the mother of child neglect.  Nothing could have been further from the truth.  The officer's recklessly false representations and material omissions caused the arrest, detention, and imprisonment of Kameron Butler.  For this, Ms. Butler seeks monetary damages, attorney's fees and costs, and a trial by jury.

### PARTIES

2.

Plaintiff Kameron Butler ("Butler") is a resident of

Rockdale County, Georgia.

3.

Defendant Charlene Michelle Smith ("Smith") is or was employed by the City of Conyers Police Department as a police officer.  Smith is sued in her individual capacity. At all times relevant to this complaint, Smith acted under the color of law.

4.

Defendant City of Conyers ("the City") is a political subdivision of the State of Georgia, which has the capacity to sue and be sued.

VENUE

5.

All acts or omissions alleged in this complaint occurred in the Northern District of Georgia, where at least one of the defendants resides, and therefore venue is properly within this district under 28 U.S.C. § 1391(b)(2).

JURISDICTION

6.

Jurisdiction for this suit is conferred in part by 42 U.S.C. § 1983, which provides in part:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory, or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the

jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

7.

Under 28 U.S.C. §§ 1331 and 1343(a)(3)&(4), the Court can entertain an action to redress a deprivation of rights guaranteed by the United States Constitution, and the Court has jurisdiction under 28 U.S.C. § 1367 to hear an action to redress a deprivation of rights guaranteed by the laws and the Constitution of the State of Georgia.

8.

Attorney's fees are authorized under 42 U.S.C. § 1988.

9.

By letter dated July 20, 2018, Butler perfected an ante litem notice of her claims (detailed in this complaint) to the City of Conyers.  See O.C.G.A. § 36-33-5(b).

FACTS

School Resource Officer

10.

A School Resource Officer ("SRO"), as the name suggests, is a police officer assigned to a school to help prevent crime and violence and enhance safety on school grounds.  According to a Memorandum of Understanding for the SRO program (dated May 6, 2015), an SRO assigned by the City

of Conyers police department to work in the Rockdale County Public School District is subject to the rules and regulations, policies and procedures, and training requirements of the City's Police Department.

11.

According to the Memorandum "the SRO shall adhere to the Rockdale County Public Schools' rules and regulations ('RCPS Rules') while on the school campus, unless the RCPS Rules and regulations conflict with the CPO rules, in which case the CPO rules shall govern."

12.

Under the Memorandum, the City's Chief of Police must provide a sworn officer to be assigned to Rockdale County High School.

13.

Among the duties and responsibilities of the SRO are:

- "To serve as a positive roll model and mentor to students."

- "To provide law enforcement information to school-based staff members ... to help meet the needs of students."

- "To enforce laws, to conduct criminal investigations, to help prevent crime and violence, and to enhance overall safety on school

grounds."

14.

The SRO works primarily "a Monday through Friday schedule," a schedule which should "closely follow the school schedule."

15.

On certain occasions, the work schedule will fluctuate to permit the SRO to work extra-curricular student events (ball games, dances, etc.).  The SRO must work these extra-curricular student events as an off-duty subcontractor in accordance with the City's police department regulations for off-duty assignments.  The SRO, when working extra-curricular events, shall not be considered an employee of Rockdale County Public Schools.

16.

According to the Memorandum, the use of confidential school records by the SRO is prohibited except as authorized by law.

<u>Jayden Butler's High School Years</u>

17.

In September 2017 Kameron Butler was a working, single mother of three children: a 19-year-old daughter, a 9-year-old daughter, and a 17-year-old son.  Only the younger daughter and the son, Jayden Butler, were then living with

Ms. Butler.

18.

In September 2017 Jayden was a student at Rockdale County High School ("RCHS").  Jayden turned 18 years old during the 2017-2018 school year.

19.

Some time around his ninth-grade year, Jayden began experiencing educational failure, school, including fights at school, truancy and tardiness.  He was also earning failing grades.

20.

Problems continued throughout Jayden's high school years, as Jayden had multiple encounters with the juvenile justice system.  On multiple occasions, Jayden's mother had to report him missing to local law enforcement.

21.

During these years, Ms. Butler worked selflessly and tirelessly to help Jayden by taking him to mental health professionals, including psychiatrists and psychologists. When Jayden required more support, Ms. Butler cooperated with the juvenile justice system fully, participating with the CHINS (Children In Need of Services) program. See O.C.G.A. § 15-11-380.

22.

In the summer of 2017, the Butler family moved just outside of the school district for RCHS.  Despite the move, RCHS permitted Jayden to continue attending RCHS (which was his preference) instead of transferring to Salem High School which was in his new school district.  Although it was his fourth year of high school, Jayden did not have enough credits to be a senior.

23.

Because the Butler family was living just outside the RCHS school district (and not on a school bus route), Jayden's mother would drop him off at the school in the morning.  Unbeknownst to Ms. Butler, though, some days Jayden would walk in the front door of the school and walk out the back door.  He would go back to the apartment and hang out with friends.

24.

Just weeks after the start of the 2017-2018 school year, the high school informed Ms. Butler that Jayden was skipping school.  Ms. Butler went to an attendance conference at RCHS in August.

25.

Jayden would lie to his mother.  He would ask his mother or her fiancé to pick him up from school, but he

would not be there.  Instead of going to school, Jayden would go to Brandon Glen apartments where he would hang around with friends who did or sold illegal drugs.

<u>Officer Smith and Jayden</u>

26.

In September 2017, City of Conyers police officer Charlene Smith was employed as an SRO at Rockdale County High School.

27.

Jayden began developing a relationship with Officer Smith.  During and after school, for example, he would spend time alone with Smith in her office.  More than once, Officer Smith drove Jayden home from school without permission from Ms. Butler.

28.

Jayden complained about his mother to Officer Smith, confiding in her that he did not like his mother's fiancé.

29.

When Ms. Butler talked about transferring Jayden to Salem High School, Jayden told his mother that she could not keep him away from Officer Smith.

30.

On September 27, after school hours, when Jayden was in Officer Smith's office, she used her speakerphone to call

Ms. Butler and insist that Ms. Butler pick up Jayden from school.  Officer Smith suggested that Ms. Butler was guilty of cruelty to children.

31.

During that phone call, Ms. Butler told Officer Smith that she was misinformed and that there was more to the story than what Jayden was telling her.  Ms. Butler explained that Jayden had displayed serious problems since the ninth grade, that Jayden was falling further behind in school, that Jayden had been referred to the CHINS program twice, and that his counselor knew about these issues.  Ms. Butler explained, however, that she was at work at a neurological clinic, and she could not elaborate during that brief phone call.

32.

At the end of the phone call, Ms. Butler offered to pick up Jayden at Pine Log Park or the school, but Jayden said he would walk home.  Ms. Butler was adamant that no one from the school was authorized to drive him home, and she told Jayden that he was forbidden to go to the Brandon Glen apartments.

33.

When Ms. Butler arrived home, she discovered that Jayden was not there.  Later that night, Jayden called his

mother from the Brandon Glen apartments, insisting that she give him a ride home.  (Jayden had done this many times before.)

34.

In that phone conversation with Jayden, Ms. Butler referred to Officer Smith as a "bitch" and refused to drive to Brandon Glen apartments to pick up Jayden.

35.

Unbeknownst to Ms. Butler, Jayden was recording the call.  Upon information and belief, Officer Smith heard the entire call (¶¶ 33-34) that night, and she was angered that Ms. Butler referred to her as a bitch.

The Arrest

36.

The next day, on September 28, Smith applied for warrants to arrest Ms. Butler on charges of cruelty to children under O.C.G.A. § 16-5-70(a)&(c).

37.

Once Officer Smith decided to apply for the arrest warrants, Smith did not consult with RCHS's social worker, DFACS caseworkers, or Jayden's mental health counselor.

38.

O.C.G.A. § 16-5-70 provides in part:

(a)  A parent, guardian, or other person

supervising the welfare of or having immediate charge or custody of a child under the age of 18 commits the offense of cruelty to children in the first degree when such person willfully deprives the child of necessary sustenance to the extent that the child's health or well-being is jeopardized.

...

(c)    Any person commits the offense of cruelty to children in the second degree when such person with criminal negligence causes a child under the age of 18 cruel or excessive physical or mental pain.

39.

Under Georgia law, the term "necessary sustenance," as used under § 16-5-70(a), has consistently been defined as that necessary food and drink which is sufficient to support life and maintain health.  Knight v. State, 233 Ga. App. 819, 821 (1998); Coleman v. State, 308 Ga. App. 731, 735 (2011).

40.

Under Georgia law, "[c}riminal negligence is an act or failure to act which demonstrates a willful, wanton, or reckless disregard for the safety of others who might reasonably be expected to be injured thereby."  O.C.G.A. § 16-2-1.

41.

In her warrant applications, Smith alleged that Ms. Butler "refused to pick her son, Jaylen [sic] Butler, up

from school," and that he had to take "Uber home."  Smith swore that "when [Butler] leaves her son ... up at Rockdale county High School from 15:05 until approximately 19:00 hrs. without food or water to indure [sic] the heat."  Smith swore that Jayden had a "heart condition" and thus "should not indure [sic] long periods without food, water or heat [sic]."  None of this was true.

42.

In her warrant applications, Officer Smith did not state Jayden's age or even his grade level.  Nor did Smith mention anything about Jayden's ongoing problems while at RCHS or Ms. Butler's efforts to help her son (see ¶¶ 18-25), information which was easily accessible to Officer Smith had she attempted to conduct a child-neglect investigation.

43.

Shortly after obtaining the arrest warrants, on September 28, 2017, at around 8:45 p.m., Smith called the Rockdale County Sheriff's Office and asked them to perform a "welfare check" on Jayden at his residence, and she informed the department's dispatch that there were "outstanding warrants on Kameron Butler ... for three counts of cruelty to children."

44.

Later the same night, RCSO deputies went to Ms.

Butler's residence to perform Officer's Smith's requested welfare check.  Everything was fine.  Yet the officers were compelled to arrest Ms. Butler on the active warrants.

45.

Ms. Butler spent the next four days in jail before she was able to bond out.

46.

The criminal charges against Ms. Butler were dismissed on January 23, 2018.

47.

As a result of the arrest, incarceration and prosecution, Ms. Butler suffered emotional, mental, and financial injury, entitling her to recover damages against the defendants for the loss of her rights, in an amount to be determined by the enlightened conscience of the jury.

<u>COUNT 1</u>

42 U.S.C. § 1983: Malicious Prosecution

in violation of the Fourth Amendment

(Officer Smith)

48.

Butler incorporates paragraphs 1 through 47 here by this reference.

49.

Officer Smith initiated a criminal prosecution against

Ms. Butler for the crime of cruelty to children, and she knew or should have known that no arguable probable cause existed to believe that Ms. Butler had committed any crime recognized by law.

50.

Officer Smith initiated the arrest and maintained the prosecution of Ms. Butler by making false and reckless statements and material omissions in her arrest warrant application and in the state prosecution, thus displaying malice and a reckless disregard for Ms. Butler's civil rights.

51.

The arrest and prosecution forced Ms. Butler to spend considerable time in jail and to appear in Rockdale County Superior Court on her criminal case with a criminal defense attorney.

52.

This criminal prosecution terminated favorably for Ms. Butler.

53.

At all times relevant to this action, the law was established with obvious clarity that arresting a citizen without arguable probable cause and depriving a citizen of her liberty violates the Fourth Amendment to the United

States Constitution and the Georgia Constitution (Art. I, §
1, ¶ I).

54.

As a result of this prosecution, Ms. Butler suffered
emotional, mental and financial injury, entitling her to
recover nominal, compensatory, and punitive damages against
the defendants in an amount to be determined by the
enlightened conscience of the jury.

Count 2

Negligence

(City of Conyers)

55.

Ms. Butler incorporates paragraphs 1 through 47 here by
this reference.

56.

This Count is alleged against the City of Conyers.

57.

Ms. Butler timely provided ante litem notice to the
City.

58.

The City of Conyers has purchased liability insurance
that provides coverage and indemnification for liability
arising from the operations of the City's police department
and the conduct of law enforcement officers employed by the

City.  That policy was in effect at all times relevant to this complaint.

59.

The purchase of liability insurance constitutes a limited waiver of sovereign immunity by the City of Conyers.

60.

The City's insurer responded to Ms. Butler's ante litem notice and declined to settle the potential lawsuit.

61.

During the course of her employment and while fulfilling her official duties, Officer Smith failed to competently assess whether probable cause existed.

62.

The City is liable for the intentional and negligent actions of Officer Smith under the doctrine of *respondeat superior* for violations of State law.  Under that doctrine, the City is not entitled to present a defense of official immunity.

COUNT 3

O.C.G.A. § 51-7-40: Malicious Prosecution

(Officer Smith)

63.

Ms. Butler incorporates paragraphs 1 through 47 here by

this reference.

64.

Officer Smith initiated a criminal prosecution against Ms. Butler for violating O.C.G.A. § 16-5-70 (cruelty to children), knowing that no probable cause existed to believe that Ms. Butler violated this Georgia statute or committed any crime recognized by law.

65.

Officer Smith initiated this arrest and prosecution of Ms. Butler with malice.

66.

This criminal prosecution terminated favorably for Ms. Butler.

67.

As a result of this arrest, Ms. Butler has suffered emotional, mental and financial injury, entitling her to recover compensatory and punitive damages against Officer Smith for the loss of her rights under this claim, in an amount to be determined by the enlightened conscience of the jury.

<u>COUNT 4</u>

Punitive Damages

(Officer Smith)

68.

Butler incorporates paragraphs 1 through 47 here by this reference.

69.

Officer Smith's actions described in this complaint displayed a want of care showing a conscious indifference to consequences as contemplated under O.C.G.A. § 51-12-5.1.

COUNT 5

O.C.G.A. § 13-6-11: Attorney's Fees

70.

Butler incorporates paragraphs 1 through 47 here by this reference.

71.

By their acts and omissions specified above, as well as other conduct, the defendants have acted in bad faith, has been stubbornly litigious and has caused Butler unnecessary trouble and expense.

72.

Butler is entitled to recover her actual expenses of litigation, including attorney's fees, from the defendant.

WHEREFORE, Butler respectfully requests the following relief:

(a)  That as to Counts 1, 2, 3, 4, and 5 the Court

award Butler compensatory damages and punitive and nominal damages against the designated defendants in an amount to be determined by the enlightened conscience of an impartial jury;

(b)   That the Court grant Butler her reasonable costs and attorney's fees in bringing this action in an amount to be determined at trial;

(c)   That Butler be granted a trial by jury on all issues so triable; and

(d)   That Butler be granted such other and further relief as this Court deems just and proper.

Respectfully submitted,

BY: /s/ Cary S. Wiggins
Cary S. Wiggins
Ga. Bar No. 757657

WIGGINS LAW GROUP
Suite 401
260 Peachtree Street, NW
Atlanta, Georgia 30303
Telephone:  (404) 659-2880
Facsimile:  (404) 659-3272
cary@wigginslawgroup.com

BY: /s/ Craig Goodmark
Craig Goodmark
Ga. Bar No. 301428

GOODMARK LAW FIRM
1425A Dutch Valley Place
Atlanta, Georgia 3032
Telephone:  (404) 719-4848
cgoodmark@gmail.com