UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KAMERON BUTLER,

      Plaintiff,

v.

CHARLENE MICHELLE SMITH,

      Defendant.

CIVIL ACTION NO.
1:19-CV-3150-JPB

## ORDER

This matter comes before the Court on Charlene Michelle Smith's

("Defendant") Motion for Summary Judgment [Doc. 53].  This Court finds as

follows:

## PROCEDURAL HISTORY

This case concerns Kameron Butler's ("Plaintiff") September 2017 arrest by

Defendant for cruelty to children.  Plaintiff filed this action on July 10, 2019,

bringing a federal claim for malicious prosecution under 42 U.S.C. § 1983 and the

Fourth Amendment to the United States Constitution and a state-law claim for

malicious prosecution under O.C.G.A. § 51-7-40 against Defendant.  [Doc. 1].

Plaintiff also sought punitive damages under O.C.G.A. § 51-12-5.1 and attorney's

fees under O.C.G.A. § 13-6-11.  Defendant filed the instant Motion for Summary Judgment on March 15, 2021.  [Doc. 53].

## FACTUAL HISTORY

The Court derives the facts of this case from Defendant's Statement of Material Facts Not in Dispute, [Doc. 53-1]; Plaintiff's Response to Defendant's Statement of Material Facts, [Doc. 65-1, p. 1]; Plaintiff's Statement of Material Facts Which Present a Genuine Issue for Trial, [Doc. 65-1, p. 29]; and Defendant's Response to Plaintiff's Statement of Disputed Facts, [Doc. 70-1].  The Court also conducted its own review of the record.

The Local Rules of this Court require a respondent to a summary judgment motion to include with its responsive brief "[a] response to the movant's statement of undisputed facts."  LR 56.1(B)(2)(a), NDGa.  The Local Rules make clear that the Court will deem the movant's facts admitted unless the respondent refutes or objects to the fact or shows that the fact is either immaterial or unsupported by the record.  Further, in accordance with the Local Rules, this Court will not consider unsupported facts.  The Court will, however, use its discretion to consider all facts the Court deems material after reviewing the record.  For the purpose of adjudicating the instant motion, the facts of this case are as follows, divided into seven sections for readability.

1.    *School Resource Officers and School Pickup Policy*

Rockdale County High School ("RCHS") uses School Resource Officers ("SROs") to provide security and law enforcement services on school premises. [Doc. 65-1, p. 1].  SROs are "uniformed, certified law enforcement officers" who cooperate with RCHS staff to enforce laws, prevent crime and violence, and promote safety on school grounds; provide law-enforcement-related education to students; encourage positive attitudes regarding law enforcement's role in society and offer law-enforcement-related counseling and mentoring; and establish a liaison with school personnel to create a safe environment that is conducive to learning.  [Doc. 61, pp. 113, 114].  SROs are assigned to specific schools but are not school employees.  [Doc. 65-1, p. 2].  During the events at issue, Defendant, Officer Troy Quick and Officer Michelle Washington were officers with the Conyers Police Department ("CPD") and worked as SROs at RCHS.  [Doc. 55, p. 8]; [Doc. 57, p. 6]; [Doc. 61, p. 7].

Under RCHS policy, students must vacate school premises by 3:30 PM unless they are participating in a supervised activity.  [Doc. 65-1, p. 3].  After that time, all doors to the school are locked.  Id.  Students who remain on school premises after the doors are locked could be charged with trespassing or loitering. [Doc. 58, p. 40].

2. *Jayden Butler*

Jayden Butler, Plaintiff's son, began attending RCHS in the 2014–2015 academic year.  [Doc. 65-1, p. 1].  In July 2017, when Jayden was seventeen years old, Plaintiff, Jayden, Plaintiff's daughter and Plaintiff's boyfriend, Montrez Porter, moved to a new apartment that was outside the RCHS school district.  Id. at 2, 9.  Because Jayden attended RCHS for the prior three years, Plaintiff obtained special permission for him to continue attending RCHS.  Id. at 3.  Jayden was a frequent visitor to the RCHS SRO office, where he would eat lunch or stop by to visit with the SROs.  Id. at 2.

Jayden had been previously diagnosed with a heart condition that Plaintiff and Jayden described as "ventricular tachycardia."  [Doc. 54, p. 69]; [Doc. 56, p. 32].  Because of this condition, Jayden occasionally wore a heart monitor.  [Doc. 54, p. 70].  Plaintiff testified that this condition eventually resolved itself and that Jayden did not need medication or medical procedures.  Id.  Plaintiff does not dispute, though, that Jayden had to wear a heart monitor multiple times.  [Doc. 65-1, p. 8].  Jayden, however, testified that he underwent an outpatient procedure to treat the issue.  [Doc. 56, p. 32].  Jayden told SRO Quick that he had a heart condition and wore a heart monitor.  [Doc. 57, pp. 78–79].  Similarly, Defendant

and SRO Washington testified that they were aware of Jayden's alleged heart condition.  [Doc. 55, pp. 38–39]; [Doc. 61, p. 88].

### 3.    *Jayden's School Pickup Situation*

Because Plaintiff's new apartment was not on the RCHS bus route, Plaintiff drove Jayden to school in the morning.  [Doc. 54, p. 34].  Plaintiff testified that she also picked Jayden up from school in the afternoons when she finished work.  Id. Plaintiff worked from 9:00 AM to 5:00 PM from Mondays to Thursdays.  Id. Plaintiff usually picked Jayden up from school between 5:00 PM and 6:00 PM. [Doc. 70-1, p. 9].  Because the school doors were locked, Jayden waited for Plaintiff outside the school, "walking back and forth" and "doing schoolwork." [Doc. 56, p. 20].  RCHS did not have water fountains outside the locked school doors, and Jayden did not have anything to eat or drink unless one of the SROs provided him with a snack.  Id. at 20–21; [Doc. 65-1, p. 3].  Defendant and school administrators told Jayden that he could not remain on campus after school hours, so he occasionally walked home instead of waiting for Plaintiff to pick him up. [Doc. 65-1, p. 5].  Jayden lived about two and a half miles from RCHS, and walking home took Jayden approximately two hours.  [Doc. 58, p. 37]; [Doc. 56, p. 15]; cf. [Doc. 65-2 (showing that Jayden's home address was three point three miles from RCHS, with a predicted walking time of one hour and six minutes).  A

shortcut reduced that time to thirty to forty minutes, but according to the testimony of Jayden and of CPD Sergeant Johnny Beaucher, that route was "dangerous" because it required Jayden to walk across the interstate.  [Doc. 56, p. 39]; [Doc. 58, p. 139].

Sometimes, Jayden walked or took the bus to Brandon Glen Apartments ("Brandon Glen"), where he would play sports with friends, even though Plaintiff forbade him to go to Brandon Glen.  [Doc. 65-1, p. 6]; [Doc. 70-1, p. 23].  Jayden testified that he went to Brandon Glen to avoid remaining at school after hours because he "would continue to get in trouble about that."  [Doc. 56, p. 16].  On other occasions, Jayden went to Pine Log Park to play basketball with a friend, and Plaintiff picked him up there.  [Doc. 65-1, p. 6].  Sergeant Beaucher described Pine Log Park as "unsafe" with "a lot of crimes" and many reports of drug deals.  [Doc. 58, p. 135]; see also [Doc. 57, p. 73] (SRO Quick testifying about gang activity, shootings and sexual assaults in Pine Log Park).

### 4. *Jayden's Interactions with SROs*

Beginning in September 2017, Jayden spoke with the SROs, including Defendant, about his poor relationships with Plaintiff and Porter.  [Doc. 65-1, p. 8].  According to Defendant, Jayden came into the SRO office "depressed and crying" and explained that he was upset because his family moved.  [Doc. 55, p. 48].

Jayden informed the SROs that Porter tried to provoke fights with him and refused to pick him up from school, even though Porter would pick up Jayden's sister from school across the street from RCHS.  [Doc. 65-1, p. 9].  Jayden testified that he told Defendant and SRO Washington that Plaintiff refused to pick him up from school, that he was hungry and that it was hot outside.  [Doc. 56, p. 74].

Jayden asked Defendant, SRO Washington and SRO Quick if one of them could take him home.  [Doc. 65-1, p. 10].  SRO Quick lived in the opposite direction, and SRO Washington had to go home to be with her children.  Id.  On September 20, 2017, Defendant said that she would take Jayden home if he waited for her daughter to finish band practice at 6:00 PM.  Id.  Defendant and her daughter drove Jayden home and dropped him at the apartment complex's leasing office, where he could obtain a key for his family's apartment.  Id.  Defendant and her daughter drove Jayden home on September 21, 2017, too, and dropped him off at the leasing office.  Id.  On September 22, 2017, Jayden told Defendant that he could no longer be dropped off at the leasing office because Plaintiff instructed the leasing office not to give Jayden access to a key.  [Doc. 55, pp. 49–50]; [Doc. 54, p. 45]; [Doc. 56, p. 66].

### 5.   *Events of September 27, 2017*

On the morning of September 27, 2017, Jayden informed the SROs via text message that he went to Brandon Glen the day before because it was hot.  [Doc. 65-1, p. 11].  He told the SROs that he had to stay the night at Brandon Glen because Plaintiff refused to pick him up.  Id.  Jayden met with the SROs at school, and they gave him food and deodorant.  Id. at 11–12.  At the SROs' direction, Jayden met with the assistant principal and school counselor, who referred the matter to the Division of Family and Children Services ("DFCS").  Id. at 12.

Defendant then called Plaintiff and recorded the conversation.[1]  Id. Defendant asked Plaintiff if Jayden would be allowed to access the apartment if he were given a ride home, and Plaintiff responded that she would not allow Jayden to have a key.  Defendant informed Plaintiff that her actions—in their "totality," including not picking Jayden up from school and leaving him to wait outside— amounted to cruelty to children.  Defendant advised Plaintiff that the school social worker and police were involved and requested a meeting with Plaintiff the following day.

---

[1] Defendant filed a recording of the phone call, from which the following facts are drawn. See [Doc. 62].

During the call, Defendant explained that because Jayden was not involved in any kind of after-school program, Jayden could not remain on school grounds after school ended or he would "technically [be] considered trespassing."  Plaintiff reiterated that Jayden would not be allowed inside the apartment, even if he otherwise secured a ride home, and that no one was authorized to drop him off.  As for Jayden's ride home on that day in particular, Plaintiff said that Jayden could wait to be picked up at Pine Log Park.  Jayden indicated to Defendant that he would go to Brandon Glen instead to avoid waiting outside in the heat.  Plaintiff said that she could—but would not—pick Jayden up from Brandon Glen, since she previously instructed him not to go there.  At the end of the call, Defendant told Plaintiff that Jayden planned to walk home, and Plaintiff said she would let him in the apartment when she arrived there that evening.

Later that day, Jayden called Plaintiff and recorded the conversation.[2]  He informed Plaintiff that he was at Brandon Glen and asked her to pick him up.  Plaintiff refused to do so.  She explained that she had expected Jayden to walk home that day, as discussed on the earlier phone call with Defendant, and that he was not there when Plaintiff arrived home.  During this exchange, Plaintiff referred

---

[2] Similarly, Defendant filed a recording of this conversation, from which the facts in this section are drawn.  See [Doc. 62].

to Defendant as "that bitch, that Officer Smith or whoever the fuck that was."
Plaintiff told Jayden to ask somebody at Brandon Glen to take him home or to call
Defendant for a ride and said that when she arrived home, she would let him into
the apartment.  Jayden then asked Plaintiff to pick him up from Pine Log Park, but
she refused, asking why he did not go to the park in the first place.  Jayden said he
was "trying to go home and you're refusing to come pick me up"; Plaintiff
responded by saying "get your ass to the house, Jayden."  Plaintiff restated that she
would not pick him up from Pine Log Park and that she could, but would not,
retrieve him from Brandon Glen.  Around 6:40 PM that night, Jayden texted
Defendant, SRO Washington and SRO Quick that Plaintiff would not pick him up
from Brandon Glen.  [Doc. 70-1, p. 17].  Defendant picked Jayden up later that
evening and drove him home.  Id.

The next morning, on September 28, 2017, Jayden sent Defendant the
recording of his phone call with Plaintiff.  Id.  Jayden also provided the SROs with
a written statement.  [Doc. 65-1, p. 17].  In that statement, Jayden explained that
Plaintiff "neglected" him on "several occasions"; that he was told multiple times
"to stay up at the school and wait until 5:45 to be picked up"; that on other days, he

waited for Plaintiff from 3:30 PM until 7:00 or 8:00 PM[3] in eighty-seven or eighty-eight degree heat; and that when he "wasn't picked up at all," he "would have to walk [two] hours home" then wait outside the apartment for four hours to be let inside by Plaintiff.  [Doc. 55-1, p. 1].

### 6.    *Plaintiff's Arrest*

On September 28, 2017, Defendant issued warrants to arrest Plaintiff on charges of cruelty to children under O.C.G.A. § 16-5-70(a) and (c).[4]  [Doc. 70-1, p. 20].  Defendant testified that she did not report the matter to DFCS prior to issuing the warrants because a referral had already been made, and officers are not required to file a second report.  [Doc. 55, p. 119]; see also [Doc. 59, p. 67].  When she decided to apply for the warrants, Defendant did not consult with RCHS social workers, DFCS caseworkers or Jayden's mental health counselor.  [Doc. 70-1, p. 20].

On the evening of September 28, Defendant texted Jayden to ask if he was home and to check on his welfare.  [Doc. 65-1, p. 19]; [Doc. 55, p. 107].  When Jayden did not respond, Defendant contacted the Rockdale County Sheriff's

---

[3] Plaintiff disputes the assertion that Jayden remained at school as late as 7:00 or 8:00 PM, although she concedes that on some days, she picked Jayden up as late as 6:00 PM. [Doc. 70-1, p. 9].
[4] Defendant also issued a warrant for Porter's arrest for violating § 16-5-70(c).

Department and requested a welfare check for Jayden.  [Doc. 55, p. 108]; see also

[Doc. 58, p. 129].  For safety reasons, Defendant informed the dispatcher that there

were active warrants for Plaintiff's arrest.  [Doc. 55, p. 110].  Sheriff deputies went

to Plaintiff's residence to perform the welfare check and subsequently arrested

Plaintiff.  [Doc. 70-1, p. 24].  Plaintiff bonded out of jail four days later.  Id.  On

the day that Plaintiff was released from custody, Jayden moved to Michigan to live

with his father.  [Doc. 65-1, p. 20].

On October 6, 2017, Plaintiff spoke with Sergeant Beaucher to lodge a

complaint against Defendant for Plaintiff's arrest.  Id. at 21.  Sergeant Beaucher

reviewed the probable cause affidavits and Defendant's incident report and

concluded that Defendant had probable cause for the arrest warrants.[5]  Id. at 23–24.

Sergeant Beaucher also determined that Plaintiff's refusal to "make any kind of

arrangements to allow Jayden to be picked up from school . . . was highly

inappropriate and criminal."[6]  [Doc. 58, p. 34].  The charges against Plaintiff were

dismissed in January 2018.  [Doc. 70-1, p. 24].

---

[5] Plaintiff does not dispute this statement but avers that Sergeant Beaucher incorrectly
determined that Defendant had probable cause for the arrest warrants.  [Doc. 65-1, p. 24].
[6] Similarly, Plaintiff does not dispute this statement but contends that Sergeant
Beaucher's assessment of Plaintiff's conduct is incorrect. [Doc. 65-1, p. 24].

### 7.    *Complaint with the Rockdale County Board of Education*

In December, Plaintiff submitted a complaint about Defendant's conduct to the Rockdale County Board of Education.  [Doc. 65-1, p. 24].  As relevant here, Plaintiff stated in the complaint that DFCS told her that it should have been permitted to investigate the incident prior to Plaintiff's arrest and alleged that Defendant arrested Plaintiff because Defendant felt "disrespected" after hearing Plaintiff call her a "bitch" on the recorded phone call.  Id. at 25.  While Defendant acknowledged that the DFCS worker may have *thought* that Defendant felt "disrespected," Defendant testified that she did not, in fact, feel that way because she did not know Plaintiff.  Id.  As to the role of DFCS in the arrest, an officer does not need to make a DFCS referral if one was already made by the school.[7]  Id. at 27.  Further, it is undisputed that law enforcement officers are not required to obtain permission from DFCS before arresting an individual for cruelty to children. Id.  Sergeant Beaucher recommended that Plaintiff's complaint as to the allegedly wrongful arrest be closed as unfounded.  [Doc. 55-2, p. 55].

---

[7] As previously noted, the school counselor referred this matter to DFCS on or around September 27, 2017.  [Doc. 65-1, p. 12].

## ANALYSIS

### A.    Legal Standard

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A material fact is any fact that "is a legal element of the claim under the applicable substantive law which might affect the outcome of the case."  Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).  A genuine dispute exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Ultimately, "[t]he basic issue before the court on a motion for summary judgment is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  Allen, 121 F.3d at 646 (citation omitted).

The party moving for summary judgment bears the initial burden of showing that no genuine issue exists as to any material fact, "and in deciding whether the movant has met this burden the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party."  Id.  After the movant satisfies this initial burden, the nonmovant bears the

burden of showing specific facts indicating that summary judgment is improper because a material issue of fact does exist.  Id.  However, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (quoting Anderson, 477 U.S. at 251). If the record taken as a whole cannot lead "a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).

## B. Federal Malicious Prosecution Claim

Defendant argues that she is entitled to summary judgment on the basis of qualified immunity as to Plaintiff's § 1983 malicious prosecution claim.  Under the doctrine of qualified immunity, government officials are shielded from liability when acting within the scope of their discretionary authority unless they violated a plaintiff's clearly established statutory or constitutional rights.  Post v. City of Fort Lauderdale, 7 F.3d 1552, 1556 (11th Cir. 1993), modified, 14 F.3d 583 (11th Cir. 1994).  Once a defendant shows that her actions were within her discretionary authority, "the burden shifts to the plaintiff to show that qualified immunity is not

appropriate."[8]  Paez v. Mulvey, 915 F.3d 1276, 1284 (11th Cir. 2019).  A

defendant is entitled to qualified immunity unless the plaintiff shows that:  (1) the

defendant violated a federal statutory or constitutional right and (2) the right was

clearly established when the violation occurred.  Id.  Importantly, "[b]oth elements

of this test must be present for an official to lose qualified immunity, and this two-

pronged analysis may be done in whatever order is deemed most appropriate for

the case."  Rivera v. Carvajal, 777 F. App'x 434, 437 (11th Cir. 2019) (quoting

Brown v. City of Huntsville, 608 F.3d 724, 734 (11th Cir. 2010)).  Below, the

Court will consider whether Plaintiff showed a constitutional violation before

proceeding, as appropriate, with the remaining qualified immunity analysis.

First, the Court must determine "whether [the] plaintiff's allegations, if true,

establish a constitutional violation."  Keating v. City of Miami, 598 F.3d 753, 762

(11th Cir. 2010) (alteration in original) (quoting Hope v. Pelzer, 536 U.S. 730, 736

(2002)).  The Court construes the facts alleged "'in the light most favorable to the

party asserting the injury.'"  Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002)

(quoting Saucier v. Katz, 533 U.S. 194, 201 (2001)).

---

[8] Plaintiff does not dispute that Defendant acted within her discretionary authority.
Therefore, the Court will not discuss further this prong of the qualified immunity
analysis.

"A constitutional claim brought pursuant to § 1983 must begin with the identification of a specific constitutional right that has allegedly been infringed." Paez, 915 F.3d at 1285.  Plaintiff claims that Defendant violated the Fourth Amendment by pursuing a malicious prosecution against her.  A plaintiff asserting a malicious prosecution claim under § 1983 must prove both a "violation of [her] Fourth Amendment right to be free from unreasonable seizures" and "the elements of the common law tort of malicious prosecution."  Wood v. Kesler, 323 F.3d 872, 881 (11th Cir. 2003) (emphasis omitted).  Importantly, "the existence of probable cause defeats a § 1983 malicious prosecution claim."  Grider v. City of Auburn, 618 F.3d 1240, 1256 (11th Cir. 2010).

To show an unreasonable seizure for the purposes of a § 1983 malicious prosecution claim, "a plaintiff must establish (1) that the legal process justifying [her] seizure was constitutionally infirm and (2) that [her] seizure would not otherwise be justified without legal process."  Williams v. Aguirre, 965 F.3d 1147, 1165 (11th Cir. 2020).  A plaintiff may show invalid legal process "if [s]he establishes either that the officer who applied for the warrant should have known that [her] application failed to establish probable cause or that an official . . . intentionally or recklessly made misstatements or omissions necessary to support

the warrant." Id.  Plaintiff argues that her arrest was legally infirm under either

method.

Under the first approach, Plaintiff argues that Defendant lacked arguable

probable cause for her arrest.  Defendant contends that she had arguable, if not

actual, probable cause.  "Probable cause to arrest exists where 'the facts and

circumstances within the collective knowledge of the law enforcement officials, of

which they had reasonably trustworthy information, are sufficient to cause a person

of reasonable caution to believe that an offense has been or is being committed.'"

Wilson v. Attaway, 757 F.2d 1227, 1235 (11th Cir. 1985) (quoting United States v.

Pantoja-Soto, 739 F.2d 1520, 1523 (11th Cir. 1984)).  Rather than a stringent

standard, "probable cause is a flexible and fluid concept, that looks instead to the

totality of the circumstances to determine the reasonableness of the officer's belief

that a crime has been committed." Paez, 915 F.3d at 1286.

In the absence of actual probable cause, an officer may still receive qualified

immunity if she had "arguable" probable cause.  Grider, 618 F.3d at 1257.  When

assessing whether an officer had arguable probable cause for an arrest, "the inquiry

is not whether probable cause actually existed, but instead whether an officer

reasonably could have believed that probable cause existed, in light of the

information the officer possessed." Montoute v. Carr, 114 F.3d 181, 184 (11th Cir.

1997).  However, if "an officer arrests without even arguable probable cause, [s]he violates the arrestee's clearly established Fourth Amendment right to be free from unreasonable seizures."  Carter v. Butts Cnty., 821 F.3d 1310, 1320 (11th Cir. 2016).

The question before the Court, then, is whether Defendant knew or should have known that her warrant applications "failed to establish probable cause." Black v. Wigington, 811 F.3d 1259, 1267 (11th Cir. 2016) (quoting Kelly v. Curtis, 21 F.3d 1544, 1553 (11th Cir. 1994)).  Defendant issued arrest warrants for Plaintiff's alleged violations of O.C.G.A. § 16-5-70.  In relevant part, that statute provides:

> (a) A parent, guardian, or other person supervising the welfare of or having immediate charge or custody of a child under the age of [eighteen] commits the offense of cruelty to children in the first degree when such person willfully deprives the child of necessary sustenance to the extent that the child's health or well-being is jeopardized.
> . . .
> (c) Any person commits the offense of cruelty to children in the second degree when such person with criminal negligence causes a child under the age of [eighteen] cruel or excessive physical or mental pain.

O.C.G.A. § 16-5-70.  When Defendant issued the warrants, she had firsthand knowledge or reasonably trustworthy information of the following facts and circumstances:

- On multiple occasions, Jayden remained at school as late as 6:00 PM, waiting outside in the heat without access to food or water;
- Jayden's options for getting home included waiting for Plaintiff to retrieve him from school at or after 5:00 PM, which was not allowed under school policy; walking two hours home; or walking thirty minutes home and crossing the interstate;
- Even if Jayden found a way home when school ended, he had no way of accessing the apartment and would have to wait outside;
- Jayden suffered from a heart condition that might place his health at risk; and
- Jayden was upset about his school pickup situation.

These facts show that Defendant had actual probable cause for her actions and certainly possessed arguable probable cause. Defendant had either personal knowledge or trustworthy information that a student under the age of eighteen with a heart condition had to wait outside his school, in the heat and without provisions, for at least two hours for his mother to pick him up. Defendant also knew that even if this student secured a timely ride home, he was not allowed to access his family home and would have to wait outside. Looking to the totality of the circumstances—as is appropriate for the probable cause inquiry—Defendant's belief that Plaintiff committed the crime of cruelty to children was reasonable. Under the facts that were within Defendant's knowledge, Plaintiff, Jayden's mother, "willfully deprive[d]" Jayden of "necessary sustenance" such that Jayden's health was in jeopardy. O.C.G.A. § 16-5-70(a).

Plaintiff contests the veracity of the facts supporting probable cause. Plaintiff argues, for example, that Jayden was not "left" at school because "he could simply have walked to the park, or walked or biked home."  [Doc. 68, p. 8]. Plaintiff claims further that the characterization of Jayden's walk home is inaccurate because he did not "have" to take the purportedly dangerous shortcut; instead, "[l]ike everyone else, he could and should walk or bike a pedestrian route of travel."  Id.  Reframing these facts as Plaintiff suggests does not help her case. It is undisputed that Jayden could walk home or wait for Plaintiff at Pine Log Park, but the fact remains that he had to do so because Plaintiff declined to timely pick him up from school or to make other arrangements for him.  Further, the facts and circumstances known to Defendant suggested that these options were neither reasonable nor safe:  Jayden's walk home took two hours (which did not address the issue of Jayden remaining in the heat for an extended period of time) or required him to cross a dangerous road; Pine Log Park was not a safe place to wait after school; and *even if* Jayden made it home safely on his own, he would still have to wait outside for Plaintiff to permit him access to the apartment.

Plaintiff argues additionally that Jayden did not have a heart condition. However, Defendant's belief that Jayden suffered from such a condition was reasonable.  He told her that he did, and he wore a heart monitor.  Plaintiff may

dispute whether Jayden did, in fact, have this particular ailment, but she does not and cannot dispute that Defendant's belief was reasonable.

With respect to whether Jayden had food and water for the period after school, Plaintiff remarks that "no one questioned whether [Plaintiff] had food at home that Jayden could bring to school (or to the park) while waiting on [Plaintiff] to pick him up."  [Doc. 68, p. 8].  Yet, as with the heart condition, Jayden told Defendant that at times, he did not have food at home, and Defendant witnessed Jayden without food or water after school.  <u>See</u> [Doc. 55, p. 24].

Moreover, Defendant justifiably relied on the information relayed to her from Jayden about his heart condition and his access to food at home.  As a general matter, "an officer is entitled to rely on a victim's criminal complaint as support for probable cause."  <u>Rankin v. Evans</u>, 133 F.3d 1425, 1441 (11th Cir. 1998). Furthermore, Plaintiff's arguments—about Jayden's options for walking or biking home, whether Jayden had a heart condition and the availability of food at home— are at odds with the probable cause standard.  When determining whether probable cause exists, an arresting officer is "'not required to sift through conflicting evidence or resolve issues of credibility, so long as the totality of the circumstances present[s] a sufficient basis for believing that an offense has been committed.'" <u>Paez</u>, 915 F.3d at 1286 (quoting <u>Dahl v. Holley</u>, 312 F.3d 1228, 1234 (11th Cir.

2002)).  The totality of the circumstances here presented a sufficient basis for Defendant's belief that Plaintiff committed the crimes for which she was arrested.

Plaintiff has not shown that Defendant knew or should have known that she lacked probable cause to issue arrest warrants for Plaintiff's arrest; rather, the facts show that Defendant had actual probable cause for her actions.  In the context of qualified immunity, "[o]nly where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost."  Malley v. Briggs, 475 U.S. 335, 344–45 (1986) (citation omitted).  That is not the case here.  Consequently, Plaintiff cannot show that the legal process justifying her seizure was infirm due to a lack of probable cause.

Under the second approach to showing that the process supporting a seizure was legally invalid, Plaintiff claims that Defendant knowingly or recklessly provided false statements and made material omissions to obtain the arrest warrants.  The Eleventh Circuit Court of Appeals uses a two-part test to determine whether a purported misstatement or omission in a warrant constitutes a violation of the Fourth Amendment.  Paez, 915 F.3d at 1287.  Under that test, the Court assesses "whether there was an intentional or reckless misstatement or omission" and then "examine[s] the materiality of the information by inquiring whether

probable cause would be negated if the offending statement was removed or the omitted information included." Id.  Plaintiff "first bears the burden of creating a genuine dispute about whether [Defendant's] accusation against [her] was intentionally false and not, for example, a mistaken belief on the part of [Defendant]." Williams, 965 F.3d at 1165.  To meet this burden, Plaintiff must "identify affirmative evidence from which a jury could find that" Defendant knowingly or recklessly included false statements or omitted material information in the warrant applications.  Id. at 1166 (quoting Crawford-El v. Britton, 523 U.S. 574, 600 (1998)).  Plaintiff failed to meet this burden.

Plaintiff claims that Defendant either knowingly or recklessly[9] made the following allegedly false statements in the warrant applications:

   –   Plaintiff refused to pick up Jayden, and Jayden had to take Uber home;

_____

[9] The Eleventh Circuit has held that "[a]n officer does not lose qualified immunity . . . if all the plaintiff can prove is that the officer made *recklessly* false statements in order to obtain a . . . warrant." Carter v. Gore, 557 F. App'x 904, 908 (11th Cir. 2014) (emphasis added).  This holding was in the context of the clearly established prong of qualified immunity.  Specifically, the court held that the law was insufficiently clear as to the constitutionality of *recklessly* providing false statements in a warrant application—but that the law was clearly established that *intentionally* making false statements was unconstitutional.  Id.  Therefore, to show a violation of a *clearly established* constitutional right and overcome an official's qualified immunity, a plaintiff must prove "that the officer perjured [her]self—that is, put forth information [s]he did not believe or accept as true—in order to obtain a  . . . warrant." Id.  This section is considering whether Plaintiff showed a constitutional violation in the first instance; but if she does make this showing, and the Court were to consider whether the violated right were clearly established, only Defendant's *intentional* misstatements would be at issue.

- Plaintiff left Jayden at RCHS from 3:05 PM until 7:00 PM in the heat and without food or water; and
- Jayden had a heart condition and thus should not endure long periods in the heat without food or water.

Plaintiff, though, offered no "affirmative evidence" to support her contention that in an effort to secure the arrest warrants, Defendant either made statements she knew to be untrue or made statements with reckless disregard for their truth. As discussed earlier, Defendant held sufficient firsthand knowledge to reasonably believe that the above facts were true. Defendant personally witnessed Jayden on school grounds after hours without food or water, she had seen Jayden wear a heart monitor and Jayden informed her that he had a heart condition. Jayden had also informed Defendant that on occasion, Plaintiff refused to pick him up. It can hardly be said that Defendant included these facts in the warrant applications with "reckless disregard for the truth." United States v. Kirk, 781 F.2d 1498, 1502 (11th Cir. 1986). Additionally, "when supporting a warrant, the statements need not actually be true; instead, a showing 'that the information put forth is believed or appropriately accepted by the affiant as true' will suffice." Strolis v. Heise, 834 F. App'x 523, 527 (11th Cir. 2020) (quoting Franks v. Delaware, 438 U.S. 154, 164–65 (1978)). Defendant reasonably believed the information in the warrant to

be true, and Plaintiff has offered no evidence to suggest that Defendant's belief was unreasonable.

Plaintiff also contends that Defendant intentionally or recklessly omitted the following facts from the warrant applications:

– Jayden's age or grade level;
– Jayden's grades and school attendance record;
– Jayden's "ongoing misbehavior," i.e., leaving school and going to Brandon Glen despite Plaintiff's instructions to the contrary; and
– Plaintiff's efforts to "help her son" despite his alleged disobedience.

[Doc. 68, p. 11].  Plaintiff's arguments here, too, are unavailing.  Defendant informed the magistrate judge who issued the warrant of Jayden's age.  [Doc. 55, p. 149].  As to the remaining omissions, Plaintiff again offers no evidence that Defendant intentionally or recklessly omitted these facts, some of which were unlikely to be within Defendant's knowledge.  Defendant testified, for example, that she was unaware of any of Jayden's behavioral issues, and she did not have ready access to his attendance records or grades.  See id. at 33–35.  Even if Defendant were aware of these alleged facts, Plaintiff does not explain why they would be relevant, let alone material, in the warrant applications.  For example, Jayden's grades or school attendance record have little bearing on Plaintiff's conduct.  Plaintiff, therefore, has not shown that Defendant intentionally or

recklessly made false statements in the warrant applications or that she did the same with regard to omitting information.

As the foregoing analysis indicates, Defendant had probable cause for Plaintiff's arrest. Therefore, Plaintiff cannot show that she suffered an unreasonable seizure and, consequently, cannot show that Defendant violated a constitutional right. Because Defendant had probable cause for the arrest, the Court need not reach the second element of a malicious prosecution claim. Likewise, having found that Plaintiff did not suffer a constitutional violation, the Court will not address whether the right at issue was clearly established. Plaintiff must meet her burden with regard to both prongs of the qualified immunity inquiry to overcome this defense. Rivera, 777 F. App'x at 437. Defendant's Motion for Summary Judgment as to Plaintiff's § 1983 claim is **GRANTED**.

**C.    Plaintiff's State-Law Claims**

Plaintiff brought a claim for malicious prosecution under O.C.G.A. § 51-7-40, as well as claims for punitive damages and attorney's fees. Defendant contends that Plaintiff failed to show the absence of probable cause, as required for a state-law claim of malicious prosecution. The Court's "Fourth Amendment § 1983 probable cause analysis applies with equal force to state common law malicious prosecution claims. The absence of probable cause is a necessary

element of common law malicious prosecution." <u>Paez</u>, 915 F.3d at 1292.  The Court concluded above that Defendant had probable cause for the arrest.  That conclusion applies to Plaintiff's state-law malicious prosecution claim, too. Consequently, Defendant's Motion for Summary Judgment as to Plaintiff's state-law malicious prosecution claim and her related claims for punitive damages and attorney's fees is **GRANTED**.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment [Doc. 53].  The Clerk is **DIRECTED** to close this case.

**SO ORDERED** this 21st day of March, 2022.

**J. P. BOULEE**
United States District Judge